Bonnie M. STEPANEK, Appellant,

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU,**
Appellee.

Civ. No. 910089.

Supreme Court of North Dakota.

Oct. 7, 1991.

Nilles, Hansen & Davies, Ltd., Fargo, for appellant; argued by Reagan Rich Pufall.

Ken R. Sorenson, Asst. Atty. Gen., Bismarck, for appellee.

ERICKSTAD, Chief Justice.

Bonnie M. Stepanek appealed from the decision of the District Court for Cass County affirming the decision of North Dakota Workers Compensation Bureau which dismissed Stepanek's claim as untimely. We reverse and remand to the Bureau for appropriate disposition.

Stepanek worked at the Town House Motor Inn in Fargo, North Dakota, from approximately July of 1983 until February of 1988. As director of housekeeping, Stepanek spent part of her time supervising and directing the work of the other maids, as well as doing some maid work herself. The maid work consisted mainly of cleaning motel rooms and furniture. In cleaning the motel rooms, Stepanek and the other maids would often be called upon to squat down or kneel upon the floor. Stepanek asserts that these activities resulted in a compensable injury to her knees.

Dr. Mark Askew diagnosed Stepanek as suffering from patellofemoral pain syndrome which is usually associated with excessive stress at the patellofemoral joint. Such excessive stress is usually associated with flexion activities such as stair climbing, squatting, or kneeling. Although the syndrome is most commonly seen after prolonged exposure to such flexion stress, it occasionally occurs through an acute dislocation where the knee is twisted abruptly causing the kneecap to deviate and bang up against the femur or thighbone. Dr. Askew also noted that Stepanek had patella malalignment, which he suspected she had ever since she was a teenager which may have resulted in Stepanek having some tendency towards patellofemoral joint pain.

During a telephonic hearing held on June 4, 1990, Stepanek indicated that she had twisted her knee in 1986 while kneeling and cleaning a bathroom. After this incident, she indicated that her knees hurt more than usual for approximately two weeks. Dr. Askew, in his deposition, stated that the 1986 episode was an inciting event. It was the evidence of this specific episode in 1986 which the Bureau primarily relied upon to deny Stepanek's benefits.

In its final determination of September 4, 1990, the Bureau found as follows:

"I.

"An application for workers' compensation benefits was filed on July 9, 1989, in connection with an alleged work injury on January 1, 1986.

"II.

"On the alleged date of injury the claimant was employed by Townhouse Motor Inn of Fargo, North Dakota.

"III.

"The greater weight of the evidence indicates that the date of injury can be determined with certainty. Claimant recalls a specific incident in the Spring of 1986 when she was kneeling as she was performing work following which claimant experienced knee pain and considerable difficulty in performing her duties for a period of about two weeks. Claimant associated the pain and her symptoms with the work injury and claimant obtained knee pads and wore them at work to alleviate her pain. Therefore, the date of the specific injury that initiated claimant's symptoms and led to subsequent problems can be ascertained with certainty to have occurred in 1986.

"IV.

"The claim was filed more than one year after the date of injury."

In its earlier memorandum opinion of August 15, 1990, the Bureau made the following findings:

"The claimant testified that she recalls a specific incident in the spring of 1986. She testified that she experienced difficulty in performing her duties for about two weeks after incident. She also testified that she obtained knee pads and

wore them at work, to help alleviate her knee pain.

"According to the testimony of the claimant, the exact date of her knee injury in 1986 cannot be ascertained. However, she did sustain a work related injury in 1986.

"Dr. Askew testified that the claimant's knee problems in 1989 are related to her injury in 1986.

"The claimant knew she had a work injury to her knee in 1986. She did not file a claim for her knee injury until July 9, 1989.

"The claimant did not file her claim for benefits within the time allowed by N.D.C.C. § 65-05-01.

"The bureau's order of July 26, 1989, is affirmed."

The Bureau thus dismissed Stepanek's claim, concluding that it lacked jurisdiction because the claim was not filed within a year of the injury. Stepanek appealed to the district court which affirmed the Bureau's decision. This appeal followed.

■ Initially we note that when an administrative agency decision is appealed to this Court from a district court, we review the decision of the agency and not that of the district court. *White v. North Dakota Workers Compensation Bureau*, 441 N.W.2d 908, 909 (N.D.1989); *Skjefte v. Job Service North Dakota*, 392 N.W.2d 815, 817 (N.D.1986). We limit our review to the record before the agency and do not consider the findings of the district court. *Asbridge v. North Dakota State Highway*

*Commissioner*, 291 N.W.2d 739, 743 (N.D.1980).

Pursuant to sections 28-32-19 and 28-32-21, N.D.C.C., we are required to affirm an administrative decision, unless one of the six numerated reasons listed in section 28-32-19, N.D.C.C., is found.[1] *In re Annexation of Part of Donnybrook Public School District No. 24*, 365 N.W.2d 514, 519 (N.D.1985).

Our process of review under section 28-32-19, N.D.C.C., essentially involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Tobias v. North Dakota Department of Human Services*, 448 N.W.2d 175, 178 (N.D.1989); *Falcon v. Williams County Social Service Board*, 430 N.W.2d 569, 571 (N.D.1988).

In determining whether or not an agency's findings of fact are supported by a preponderance of the evidence, "we do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence." *Tobias*, 448 N.W.2d at 178-179.

Section 65-05-01, N.D.C.C., sets forth the procedures for filing workers compensation claims.[2] It, at the time of Stepanek's application, provided in relevant part:

1. We note that the 1991 Legislative Assembly made a number of changes in Chapter 28-32, N.D.C.C., none of which are at issue in this case. *See*, S.L.1991, Ch. 342.

2. The Legislative Assembly has subsequently slightly changed the language of section 65-05-01, N.D.C.C., which now reads:
 *"Claims for compensation—When and where filed.* All original claims for compensation must be filed by the injured worker, or someone on the injured worker's behalf, within one year after the injury or within two years after the death. The date of injury for purposes of this section must be the actual date of injury when such can be determined with certainty by the claimant and bureau. When the actual date of injury cannot be determined with certainty the date of injury must

be the first date that a reasonable person knew or should have known that the injury was related to employment. No compensation or benefits may be allowed under the provisions of this title to any person, except as provided in section 65-05-04, unless he or she, or someone on his or her behalf, files a written claim therefor within the time specified in this section. Such claim must be filed by:
 1. Delivering it at the office of the bureau or to any person whom the bureau by regulation may designate; or
 2. Depositing it in the mail properly stamped and addressed to the bureau or to any person whom the bureau by regulation may designate."

*"Claims for compensation—When and where filed.* All original claims for compensation shall be filed within one year after the injury or within two years after the death. The date of injury for purposes of this section shall be the actual date of injury when such can be determined with certainty by the claimant and bureau. When the actual date of injury cannot be determined with certainty the date of injury shall be the first date that a reasonable person knew or should have known that the injury was related to employment."

The Bureau contends that Stepanek's injury could be determined with certainty and that Stepanek reasonably knew that her injury was reasonably related to employment back in 1986. Thus, the Bureau determined that Stepanek's claim was untimely filed.

 Even if we were to accept the Bureau's factual determination that Stepanek's injury was caused by the 1986 incident,[3] we cannot accept the Bureau's nar-

---

**3.** The determination of the Bureau that the greater weight of the evidence supported the conclusion that Stepanek's condition followed a specific incident in the spring of 1986 is not one a reasoning mind could reasonably have concluded given the evidence before the Bureau. The Bureau apparently takes great stock in the fact that in Dr. Askew's medical report he indicated that Stepanek had denied knee problems prior to the squatting episode in 1986. It is inappropriate for the Bureau to take this one statement out of Dr. Askew's record and use it *to override his medical opinion and diagnosis.* Upon review of the deposition of Dr. Askew, it is clear that it was his medical opinion that Stepanek's condition was not caused by a single incident; but rather, *was caused by repeated flexion stress.* Dr. Askew further testified that such flexion stress was consistent with the job activities Stepanek engaged in at the Town House Motor Inn. In his deposition, Dr. Askew was asked the following questions:

"Q Just I guess to cut right to the chase then, do you have a medical opinion on whether or not Bonnie's present knee difficulties arise from her previous employment at the Town House Motor Inn when she was doing cleaning for that employer some years ago?

"A It is my opinion that her knee problems were related to the activities. She had told *me that she did a great deal of squatting and* kneeling at work. And that that would be consistent with problems involving the patellofemoral joint, which is what I suspected her *problems were related to.*

 \* \* \* \* \* \*

"Q ... Do you have an opinion as to whether her work at the Town House Motor Inn could be considered the primary cause of the disfunction in her knee that she is experiencing now?

"A I first saw Bonnie I guess it was in April of '89, at which time she related that she twisted her knee as she was squatting down at work. Examination then and history revealed that she had done a lot of squatting, kneeling for some period of time. And there-

fore it would certainly be again consistent that she had had those problems.

 \* \* \* \* \* \*

"Q Now the condition that you have described Bonnie as having in her knee, whichever medical term you want to place on it, is this a condition that is more likely to arise from a single traumatic incident, or is it more likely to arise over a stress or pressure over a period of time?

"A It is more commonly seen after a prolonged exposure to a flexion stress that I was talking about. Occasionally though we can see a patient that has had acute dislocation where they twist their knee abruptly and the kneecap then deviates in a lateral direction very quickly and gets banged against the femur or thighbone. And then you can have really an active picture that looks like somebody that might have problems for several months due to the kneeling or squatting activities.

 \* \* \* \* \* \*

"Q I think you probably already answered this question but I am going to try to ask you *one more time just to make sure I have got it* straight.

I think it is fair to say that the position being established by the bureau is that there *was this single incident in the squatting that is* noted in your medical records when she remembers her knee hurting and remembers the symptoms continuing after that. And that that particular event was the time at which her knee was injured. Whereas Ms. Stepanek feels that the injury arose over the course of time doing the repetitive squatting and pushing with her knee while she was performing her job duties.

"Q Is it possible for you to know as a physician which of those two events is true or more true than the other.

"A At this time it would be impossible to say. In most likelihood it would be a combination of both episodes where again repetitive excess stress is more likely or is more commonly the cause in the majority of patients that I see.

 \* \* \* \* \* \*

"Q In the minority of cases in which the injury arises out of a single event, can you

row construction of section 65–05–01, N.D.C.C. Justice Levine, writing for the Court in *Evjen v. North Dakota Workers Compensation Bureau,* 429 N.W.2d 418, 421 (N.D.1988), first noted the absurdity that a narrow interpretation of section 65–05–01 would have. Subsequently, this Court in *White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d 908, speaking through Justice Meschke, held that section 65–05–01 implemented a reasonable person's standard for determining when a claimant knew or should have known that he had a compensable injury. *White,* 441 N.W.2d at 911.

▇ What the Bureau's determination fails to take into account in this case, is that it is not enough to support a denial of a claim to show that a claimant knew or should have known that she had a work-related injury, or that a work-related injury occurred more than one year before the claim was filed. The inquiry is whether or not the claimant knew or should have known that she had a *compensable* work-related injury. In other words, the term "injury" as used in our statute must be read with reference to a "compensable" injury.[4] In *White,* we said:

> characterize for us the level of severity or violent actions so-to-speak that is necessary to cause that particular kind of injury? You mentioned a football player that sounds like a—
> "A It is usually a relatively abrupt stress...."
> "Q Is it possible for you to say whether a single incident of simply squatting down would be sufficient to produce the condition that you see Bonnie's knee being in today and in the recent months.
> "A I think it is unlikely that that would occur, but possible."
> Although an agency does not have to accept the testimony of experts, the agency must give reasons and support for why it chose not to accept the expert's opinions. *See, DeChandt v. North Dakota Workers Compensation Bureau,* 452 N.W.2d 82, 83 (N.D.1990); *Hayden v. North Dakota Workers Compensation Bureau,* 447 N.W.2d 489 (N.D.1989). Additionally, "[a]n administrative agency may not select certain parts or rely only upon a part or segment of ... [an expert's opinion], but must take into consideration the entire medical report or reports, including the history." *Claim of Bromley,* 304 N.W.2d 412, 417 (N.D.1981) (citing *Hassler v. Weinberger,* 502 F.2d 172 (7th Cir.1974).)

"The Bureau's argument would be more persuasive if the statute provided that the period for filing a claim began on the date of an accident. *See* 3 Larson, Workmen's Compensation Law, § 78.41(b) (1989). Instead, NDCC 65–05–01 requires knowledge of a compensable injury to begin the period for filing a claim. *Teegarden v. North Dakota Workmen's Compensation Bureau,* 313 N.W.2d 716 (N.D.1981). The Bureau has ignored that an apparently minor injury may develop into a compensable injury and that a doctor may not immediately diagnose an injury as work-related or compensable. 3 Larson, Workmen's Compensation Law, § 78 (1989). In those instances, the Bureau's interpretation would impel employees to ' "rush in with claims for every minor ache, pain, or symptom" in order to make sure that any future claim for compensation will not be deemed untimely.' *Evjen, supra,* 429 N.W.2d at 421."

*White,* 441 N.W.2d at 910.

▇ In this case, there is no evidence which indicates that Stepanek knew in 1986 that she had a compensable work-related injury. In fact, there is no evidence that indicates that her knee injury was compen-

> We further note that the Bureau is charged with finding the actual date of injury *"with certainty."* Section 65–05–01, N.D.C.C., at the time of this claim read in relevant part: "The date of injury for purposes of this section shall be the actual date of injury *when such can be determined with certainty* by the claimant and the bureau. [Emphasis added.]" In light of Dr. Askew's testimony, the record does not support the conclusion that the episode in 1986 is the cause of the medical problems Stepanek has with her knees nor does it support the conclusion that the 1986 event, with certainty, amounted to a "compensable injury."

4. This Court as early as in *Beauchamp v. North Dakota Workmen's Compensation Bureau,* 126 N.W.2d 417 (N.D.1964), notes that the term "injury" as used in the workmen's compensation statute has reference to a "compensable injury." *Id.* at 420. The bright line "incapacity to work test" adopted in *Beauchamp,* has subsequently been eroded by statutory changes, but our holding that the term "injury" must be read with reference to a "compensable injury" remains intact. *See, White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d at 910.

**6**

sable in 1986. The greater weight of the evidence indicates that, in fact, the knee injury was not compensable in 1986. Stepanek testified, during the telephonic hearing, that subsequent to the 1986 episode

5. We recognize that the fact that a person continues to work following some accident or event is not and cannot be determinative. The inquiry is whether or not the person knew or should have known that he or she had suffered a compensable injury. The date an injury becomes or is compensable is not necessarily synonymous with the date the injury makes work impossible. However, the fact that a person continues to work following some accident or event is evidence of whether or not the person reasonably knew or should have known that he or she was suffering from a compensable injury. In terms of the language used in *Evjen,* evidence that a person continued to work following some accident or event is relevant to show whether or not a person is aware that the work-related injury is a *"significant health problem."*

Likewise, the fact that a person did not seek out and receive medical attention is not necessarily determinative. But the fact that a person did not seek medical attention may be evidence that one was not reasonably aware that the person had suffered a compensable injury.

6. Regarding her knee pain following back surgery, Stepanek testified as follows:

"Q When did you again notice any difficulty with your knees?
"A After I'd had my back surgery. It was about—
"Q Maybe you better explain why you had your back surgery, just generally speaking.
"A Okay. I had a back injury at the Townhouse. I avoided the surgery about nine months hoping that maybe I wouldn't have to have it, but I eventually had to have back surgery, a spinal fusion done. And this was in the end of November of—I think it was '88. And by—oh, it was around Christmas time, or thereafter, I was wearing a metal back brace, and I noticed because I couldn't bend everything had to be done squatting. I was using my legs to support all my body weight going up and down, because I couldn't bend.
"Q Just to make sure that we're—the people on the other end of the telephone line are clear on this, you're talking about having a back brace on your back that kept your back stiff; is that correct?
"A Right.
"Q And did that back brace render you unable to bend over from the waist?
"A Yes.
"Q So, if you had to pick something up how would you do it?
"A I had to squat.
"Q Okay. And why don't you just continue on from there. What effect did this have on your knees?

she continued to work.⁵ It was not until the fall of 1988 following back surgery that Stepanek asserts that the pain in her knees became disabling.⁶ It was also in the fall of 1988 that Stepanek sought and received

"A I noticed that my knees—there were times when I'd get down squatting and I have to grab onto the cupboard or table to get up, because my knees wouldn't support my body weight coming up.
"Q Was it that they were weak or in pain or both?
"A Both. They were really, really—it's hard to explain. It felt like they were being torn apart inside.
"Q Now, was this something that started and gradually got worse, or was it something that was just there from the moment you had the back brace on?
"A No. It started and just got worse.
"Q And can you kind of tell us how bad did it get and how quickly did it get that bad?
"A It started bothering me right around Christmas time, and it just—it got worse and worse and worse, and the more I had to squat—and I tried to avoid the squatting, going up and down. But, of course, you have to do it when there's nobody else around to do it for you, and it just got worse and worse."

Dr. Askew, in response to questions regarding Stepanek's back surgery followed by the wearing of a back brace, testified as follows:

"Q Now we have also had testimony from Ms. Stepanek that after she left her employment at the Town House Motor Inn she went through a period of some time in which she did not have any great difficulty with her knees and that they began to give her trouble again after she was fit with a back brace following back surgery in 1989 [1988].
"Now do you have a medical opinion on whether something happened after that back surgery and being fitted with that back brace that would have been the cause of the knee injury, or whether it would simply have been that the knees had previously been injured and the kind of unusual moving and bending with her knees that she was forced to do because of her back brace simply caused the symptoms of the previous injury to arise?
"A The problems that Bonnie had would be present or the damage that she had done to her knee would be present and could be aggravated by activities that would involve further exercise. Anything that basically the patellofemoral joint is sensitive if you will to activities involving flexion of her knee. It is further aggravated by activities involving lifting of weights or sitting for prolonged periods of time.
"The inactivity after a back surgery could result in some problems in that there maybe less walking and those types of activities to the knee that can result in some problems at the joint because the articular surface may

medical attention for her knees and was told that her knee pain was related to her former work.

In *Evjen v. North Dakota Workers Compensation Bureau*, 429 N.W.2d 418, this Court ruled that a Bureau finding that a claim was filed more than one year after the claimant knew or should have known that his headaches were related to work, was supported by a preponderance of the evidence. In *Evjen*, we noted that the record demonstrated that Evjen knew he was having headaches that were causally related to his employment and that his physician recommended that he stop working the afternoon shift because of them. Furthermore, Evjen had been specifically told by a physician that his headaches were caused by significant stress on the job and that they were a *"significant health problem." Id.* at 420. In discussing the importance of this fact, this Court in *Evjen* said:

"Unlike the claimant in *Teegarden*, Evjen received specific medical advice that his injury was related to his employment *and also that it was a significant health problem.* Without that advice, this would be a different case because headaches are fairly common afflictions often suffered by many from job stress. A reasonable lay person would not immediately file a claim for compensation upon learning that occasional headaches were work-related. [Emphasis added.]"

*Evjen*, 429 N.W.2d at 420.

In other words, Evjen was reasonably aware that he had a work-related compensable injury. In this case, Stepanek testified that the pain in her knees arose about two years after working at the Town House Motor Inn. She further testified that the soreness would "go away" at night or over the weekend. Even if we assume that such soreness did not arise until after the incident in 1986, it still does not establish that Stepanek knew or should have known that she had suffered a compensable injury. Dr. Askew testified in relevant part:

"Q Now if Ms. Stepanek has testified earlier that while working at the Town House Motor Inn she would notice pain and discomfort in her knees and in particular the one knee after doing some of these job duties, and that they arose over a period of time and persisted while she had that employment. And then she did not experience those symptoms at least as acutely after she left the job. Does that sound consistent with the kind of condition we have been talking about?

"A Yes, it does.

\* \* \* \* \* \*

"[Q] One of the issues that we have to resolve in this hearing is when Bonnie should have known that she had a significant bodily injury arising out of her employment. Given your examination and the condition she has and your understanding of how it arose during her employment at the Town House Motor Inn, would it be possible for her to have, or

not be nourished as well and can result in some problems. So it is possible that for whatever reason she did aggravate her joint at that time, even though she still had the underlying problem from her previous work. Does that answer your question?

\* \* \* \* \* \*

"Q And would it then be possible because of the maybe unusual knee flexion that she would have to do because of being unable to bend from her waist with the back brace that that would cause those symptoms to again surface?

"A That is very consistent where she would if she was in a back brace wouldn't flex forward at the waist and have more of a tendency to bend down at the knees so as to reduce stress on her back, it does put more stress on the knees.

"And to give you an idea of what we are talking about your stress differences-wise if you just walk you put probably one times your body weight at the patellofemural joint, just straight ahead walking. If you then go upstairs those stresses can go up two to three times body weight. Going downstairs anywhere from three, four, sometimes five times body weight. And then if you squat or kneel some people think that those stresses can up to maybe ten or at least seven to eight times body weight. So give you an idea of what stresses.

"So if you are bending down and placing all of that weight on your knees and you would be getting more into a squatting position as you would do that with a back brace on it would put a lot of stress on the knees."

likely for her to have with the injury that she had sustained, would it be possible in your estimation for her to have experienced pain and other symptoms from that injury but that those symptoms would subside upon rest such that she would be able to dismiss those symptoms as being of a minor ache and pain nature, rather than so severe and debilitating that she should have realized she had a long-term, permanent, serious injury, is that a question you can answer?

"A I think I can answer it. In my clinical practice I constantly see patients that have had patellofemural pain for several months prior to coming into the office. And it is often something that they disregard initially. And then it doesn't go away. So then they come in to see me for evaluation.

"Q So if I asserted to you that Bonnie had experienced pain in her knees while performing the job duties at the Town House that we have mentioned, but she dismissed those as being kind of an ache, a daily ache and pain nature, and then did not realize she had a serious and permanent injury until the symptoms arose more acutely after she wore the back brace, would you accept that as being medically possible?

"A Yes."

Dr. Askew further indicated that the symptoms Stepanek suffered from were often "activity-related," and that a person will show significant improvement by simply avoiding such activities as walking up and down stairs.

In this case, we do not believe that a reasonable basis exists for the Bureau's conclusion that Stepanek knew or should have known that she suffered a compensable injury in the spring of 1986. There is no evidence in the record which indicates that Stepanek's injury was compensable in the spring of 1986. The earliest date that Stepanek could have reasonably known that her knee injury was compensable and related to employment was in the fall of 1988 following her back surgery.

We conclude that Stepanek's claim was filed within one year of the date of injury within the meaning of section 65–05–01, N.D.C.C. We reverse the judgment of the district court affirming the decision of the Bureau and remand to the Bureau for appropriate disposition.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.