Merlin H. ROGERS, Appellant,

v.

NORTH DAKOTA WORKERS
COMPENSATION BUREAU,
Appellee,

and

New Salem Farmers Elevator,
Respondent.

Civ. No. 910323.

Supreme Court of North Dakota.

March 19, 1992.

Stephen D. Little of Dietz & Little, Bismarck, for appellant.

Dean J. Haas, Asst. Atty. Gen., Bismarck, for appellee.

VANDE WALLE, Justice.

Merlin Rogers appealed from a district court judgment affirming a North Dakota Workers Compensation Bureau order dismissing his claim because it was untimely filed. We affirm.

Merlin worked in grain elevators for approximately 25 years. He smoked heavily for approximately 40 years. He sought medical attention for some breathing problems in May, June, and July of 1988.[1] In

---

1. The medical records from those visits indicate that on May 18, 1988, Merlin had a severe airway obstruction. He returned on June 1 and the severe obstruction remained unchanged. He was again seen on June 8 and the severe obstruction was still unchanged. On July 27 the obstruction was improved. However, at that time he was advised that he would be "likely to experience progressive lung disease if he continu[ed] smoking and working in his present environment."

March of 1990 he was informed that he could not return to work due to his progressive lung disease, and he then filed a workers compensation claim. The Bureau dismissed his claim, based on the following findings of fact and conclusions of law:

## "FINDINGS OF FACT

### IV.

Claimant was diagnosed as having chronic bronchitis and pulmonary emphysema; a permanent lung disease.

### V.

Pulmonary tests performed on May 18, 1988, showed a very severe hyperinflation and air obstruction of the claimant's lungs.

### VI.

The weight of the evidence including in particular Dr. Hughes' statement on June 7, 1990, indicates that the claimant was informed of the adverse relationship between his further employment and his lung disease on July 27, 1988.

### VII.

Claimant knew or a reasonable person should have known that the condition was related to his employment on or before July 27, 1988.

### VIII.

Section 65–05–01 of the North Dakota Century Code requires that all original claims for compensation shall be filed within one year of the injury, or if the date of injury cannot be determined with certainty, within one year of the date a reasonable person knew or should have know [sic] that the injury was related to employment.

### IX.

The claim was not filed within one year of the date of injury.

## CONCLUSIONS OF LAW

The Workers Compensation Bureau does not have jurisdiction over this claim."

Merlin requested and was granted a formal hearing, after which the Bureau issued an order affirming the dismissal. On appeal to the district court, the court affirmed the Bureau's decision.

■ On appeal to this court, we look to the Bureau's decision and not the decision of the district court. *Stepanek v. North Dakota Workers Compensation Bureau,* 476 N.W.2d 1 (N.D.1991). Agency decisions are reviewed by this court using a three-step process: "(1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law?" *Stepanek,* 476 N.W.2d at 3 (citations omitted); section 28–32–19, NDCC. On review, we do not exercise independent judgment of the facts presented but we only determine if a " 'reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record.' *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979)." *Jones v. Workers Compensation Bureau,* 461 N.W.2d 273, 274 (N.D.1990).

■ In order to claim compensation a worker must sustain a "compensable injury".[2] NDCC § 65–05–05. All claims for

---

**2.** North Dakota statute defines compensable injury in regard to a disease as:

"Any disease which can be fairly traceable to the employment. Ordinary diseases of life to which the general public outside of the employment is exposed shall not be compensable except where the disease follows as an incident to, and in its inception is caused by a hazard to which an employee is subjected in the course of his employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease includes impairment and effects from radiation fairly traceable to the employment. It need not have been foreseen or expected, but after it is contracted, it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence. However, preventa-

worker compensation must be timely filed, in order for the Bureau to have jurisdiction. Section 65–05–01, NDCC, states in part:

"All original claims for compensation must be filed by the injured worker, or someone on the injured worker's behalf, within one year after the injury or within two years after the death. The date of injury for purposes of this section must be the actual date of injury when such can be determined with certainty by the claimant and bureau. When the actual date of injury cannot be determined with certainty the date of injury must be the first date that a reasonable person knew or should have known that the injury was related to employment. No compensation or benefits may be allowed under the provisions of this title to any person, except as provided in section 65–05–04, unless he or she, or someone on his or her behalf, files a written claim therefor within the time specified in this section." [3]

In deciding whether a claim was timely filed, "[t]he inquiry is whether or not the claimant knew or should have known that [he or] she had a *compensable* work-related injury." *Stepanek v. North Dakota Workers Compensation Bureau,* 476 N.W.2d 1, 5 (N.D.1991) (emphasis in the original); *see also White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d 908 (N.D.1989).

Merlin argues that he could not have known that his lung condition was causally related to his employment in 1988, because he was not diagnosed until March 1990;

therefore, he did not believe he had a compensable claim until that time. However, from the evidence in the record, we can realize how a reasoning mind could determine that in July of 1988 Merlin was aware that his work was related to his compensable lung problems.

The record reflects that Merlin was aware that the dust exposure at his job was contributing to his health problems in 1988. He sought medical attention and was seen by Dr. Dale Davis on May 18, 1988. He was diagnosed as having a severe airway obstruction. He had experienced shortness of breath and coughing spells for the last three months when working around grain dust. "Grain elevator" was listed as his occupation exposure. He was again seen by Dr. Davis on June 1 and 8, 1988, and the obstruction was unchanged.

In July of 1988, Merlin was seen by Dr. Hughes. Dr. Hughes's notes of that examination indicate they discussed the possibility of Merlin quitting work.[4] Merlin did not want to quit at that time because he was close to retirement. In a letter to the Bureau of June 27, 1990, Dr. Hughes states:

"The patient was first advised by me to quit smoking and to consider leaving his job when I first took over his care from Dr. Dale Davis on July 27, 1988. He felt that since he was four or five years from retirement that he should continue working, despite the fact that I felt continued exposure to grain dust in the elevator

tive treatment for communicable diseases is not compensable under this title." NDCC § 65–01–02(8)(a)(1).
The statute defines "fairly traceable" as:
"'Fairly traceable to the employment' when used to modify the term 'disease' means only a disease which:
a. Arises under conditions wherein it is apparent to the rational mind upon consideration of all the circumstances that there is a direct causal connection between the conditions under which the work is performed and the disease;
b. Can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

c. Can be fairly traced to the employment; ...." NDCC § 65–01–02(17).

**3.** We have previously recognized that a "reasonable person" is a "reasonable lay person and not a person learned in medicine." *Teegarden v. North Dakota Workmen's Compensation Bureau,* 313 N.W.2d 716, 718 (N.D.1981).

**4.** His office notes state "I advised him that he is likely to experience progressive lung disease if he continues smoking and working in his present environment. He is 5 years from retirement and feels strongly that he should continue working."

would enhance the progression of his obstructive lung disease....

\*   \*   \*   \*   \*   \*

"Consequently, I would state that I first informed Mr. Rogers of an adverse relationship between his further employment and his adverse lung disease in July of 1988."

Merlin himself indicated that he was told of the adverse relationship between his health and place of work in July of 1988. In response to questions of what doctor and on what date he was informed that "emphysema" was a result of his employment, Merlin responded; "Dr. James Hughes told me on July 27, 1988." This evidence supports the Bureau's determination that in July of 1988 Merlin was aware that his health problems were related to his work environment.

Dr. Hughes and Merlin testified before the Bureau. Although Dr. Hughes did not retract any statements made in his written notes or letters, he did indicate that he may not have been as direct with Merlin in regard to the effect of his work environment on his lung condition. He testified that eliminating tobacco was his main focus in July 1988. However, he also discussed Merlin's work environment as a cofactor in the progression of his lung disease in July of 1988. Merlin testified that although he was aware that his work environment was related to his condition at that time, he was not aware of the seriousness of his lung disease until March 1990.

However, there is medical evidence in the file that indicates that Merlin was aware of the seriousness of his health problems. He was seen by Dr. Davis in May and twice during June of 1988. The medical records indicate Merlin had a severe "airway obstruction." In July his condition was improved but Dr. Hughes told him that he should quit smoking and working to avoid further deterioration.

A reasoning mind could conclude that Merlin had knowledge of a compensable injury once he knew that his emphysema was a result of his employment and was informed that he should quit working.[5]

Merlin asserts that our decision in *Teegarden v. North Dakota Workmen's Compensation Bureau*, 313 N.W.2d 716 (N.D. 1981) controls this case. In *Teegarden*, we reversed the Bureau's decision that denied a worker's claim because it was not timely filed. Teegarden worked in a grain elevator located in Hunter, North Dakota. He experienced some lung problems soon after he began work. Throughout the 1970's he had reoccurring lung and pneumonia problems. In April of 1980 he was hospitalized with bronchitis and was told by his doctor that he could no longer work at the elevator due to his sensitivity to dust. He filed a disability claim with the Bureau which was denied. The Bureau determined that because of his exposure to grain dust and medical problems throughout the years, he had not filed within one year after he knew that his respiratory problems were related to exposure to grain dust. After a hearing and testimony the Bureau affirmed the denial, and on appeal to the district court the Bureau was affirmed. In reversing the Bureau's decision, we said:

"The Bureau made no specific finding of fact as to when the claimant knew or should have known that his disability was fairly traceable to his employment, nor are we aware of any evidence that establishes this fact. The evidence establishes that the physician advised only that the claimant was to avoid dust and to quit smoking, but does not otherwise establish any basis that claimant should have known that the work *caused* the disease. The evidence may have been sufficient to convince the doctor that the work caused the injury, but the doctor did not articulate this to the claimant. We cannot expect the ordinary claimant to have knowledge in medical matters comparable to that of a doctor."

*Teegarden*, 313 N.W.2d at 719 (emphasis in the original).

---

5. The dissent ignores this evidence of Merlin's knowledge and our standard of review in appropriately observing that the focus of the question must be on what Merlin "knew," not what Dr. Hughes wrote in his notes.

We believe that the Bureau's findings in this case distinguish it from *Teegarden.* Dr. Hughes's notes and letters regarding the July 1988 examination, as well as Merlin's own admission, support the finding that Merlin knew in 1988 of his compensable injury and the adverse effect of his place of work on his health.

Except for the symptomatology and diagnosis, this case is not similar to *Teegarden.* Rather, it is similar to the situation in *Evjen v. North Dakota Workers Compensation Bureau,* 429 N.W.2d 418 (N.D. 1988). In *Evjen,* the record reflected that the claimant knew that his illness (headaches) was related to his work. He and his physician discussed the possibility of changing shifts to eliminate some of the job stress associated with the headaches. Evjen received medical advice that his headaches were related to his employment and that they were a "significant health problem." Also, the Bureau had specific findings that Evjen was aware of his work related headaches over a year before he filed for benefits. The Bureau's decision to dismiss Evjen's claim was affirmed by this court.[6] *Id.*

▌ Merlin urges us to liberally construe section 65–05–01, NDCC, citing *White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d 908 (N.D.1989). However, we cannot ignore the clear language of the statute under the guise of a liberal construction. *Evjen v. North Dakota Workers Compensation Bureau, supra.* In *White,* we stated that "NDCC 65–05–01 requires knowledge of a compensable injury to begin the period for filing a claim." *White, supra* at 910. Any doubt about whether or not a claimant can determine the actual date of a compensable injury, should "be resolved by testing the claimant's knowledge under the reasonable person standard."[7] *Id.* From the evidence in this case a reasonable person could determine that Merlin had suffered a compensable injury in July of 1988; and as a result of seeking medical care he was aware that his injury was work related.

The judgment affirming the Bureau's dismissal of Merlin's claim for compensation is affirmed.

ERICKSTAD, C.J., and LEVINE, J., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice Johnson not being a member of this Court at the time this case was heard did not participate in this decision.

MESCHKE, Judge dissenting.

This category of workers' claims is sad, difficult, and distressing. When he needs

---

**6.** In *Evjen,* we invited the legislature to reconsider the running of the claim period for a compensable injury:

> "[W]e invite legislative reconsideration of § 65–05–01, N.D.C.C. To begin the running of a claim period, the claimant should have had reason to be aware of the seriousness of his injury or disease, 'since any other rule would force employees to rush in with claims for every minor ache, pain, or symptom.' 3 A. Larson, *Workmen's Compensation Law* § 78.-41(e), p. 15–213. *See also* 3 A. Larson, *supra,* § 78.52. Starting the period within which to file a claim at 'the first date that a reasonable person knew or should have known that the injury was related to employment' encourages employees to 'rush in with claims for every minor ache, pain, or symptom' in order to make sure that any future claim for compensation will not be deemed untimely. The present statute imposes an unnecessary burden on the Bureau, the workers compensation fund, employers and employees. At the same time, the statute discourages and penalizes employees who attempt to keep working, rather than filing a claim, after learning that an injury is related to employment. '[I]t seems to us palpably unjust to the employee to deny him compensation because he has tried to keep his place on the employer's pay roll by doing his regular work.' *Baldwin v. Scullion,* 50 Wyo. 508, 62 P.2d 531, 539 (1936)."

*Evjen v. North Dakota Workers Compensation Bureau,* 429 N.W.2d 418, 421 (N.D.1988). Our research of the two intervening legislative sessions revealed no such proposal.

**7.** In *White,* we observed that "Whether or not White knew or should have known that he had a compensable injury must be judged in view of 'his own education and intelligence.'" *White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d 908, 911 (N.D.1989) (citing *Teegarden v. North Dakota Workmen's Compensation Bureau,* 313 N.W.2d 716, 718 (N.D.1981)).

it most, after nearly a lifetime of work, Rogers' safety net is taken away because he was too ignorant about the medical causes and the legal effects of his illness when it began, before it was really compensable. That is not reasonable. Rogers was only fifty-four in 1990, not yet due for retirement.

Agency officials, necessarily calloused by the wearisome procession of wrenching and weaseling claims, are hardened to the harsh effect of a denial of an individual claim. Legislators, attentive to the problems pressed by groups more organized than a few wornout workers, seem indifferent, as note 6 of the majority opinion unhappily reports. I believe that the judicial branch must seek to more carefully apply a law when faced with such institutional apathy. Therefore, I respectfully dissent.

Despite the recognition that the "symptomatology and diagnosis" in Rogers' case is similar to that in *Teegarden*, the majority opinion concludes that the Bureau's findings in this case distinguish it from *Teegarden* because Dr. Hughes' professional reports can be read to say that he told Rogers what caused his illness. I disagree. The focus of the question must be on what Rogers "knew", not on what Dr. Hughes wrote in his notes.

The agency and the majority (at note 3) expect that a "reasonable lay person" will grasp fully and readily what a doctor or lawyer briefly tells that person. That is contradicted by common experience, as this case illustrates. What a trained medical or legal professional might grasp quickly, and what a reasonable lay person may coincidentally understand will vary widely. *See Stepanek v. N.D. Workers Compensation Bureau*, 476 N.W.2d 1, 3, n. 3 (N.D.1991). I believe that it is unreasonable to conclude that Rogers' should have understood enough about the medical and legal consequences of his condition in 1988 to promptly file a workers' compensation claim.

If Rogers' medical insurance covered the minor immediate expenses in 1988, and if Rogers was able to continue working, it was not then a "compensable" claim. Without direct expenses or loss of time, it is unreasonable to expect a worker to understand that he must file or be forever barred if it worsens.

The evidence establishes that the physician advised only that the claimant was to avoid dust and to quit smoking, but does not otherwise establish any basis that claimant should have known that the work *caused* the disease.
*Teegarden v. N.D. Workmen's Compensation Bureau*, 313 N.W.2d 716, 719 (N.D. 1981) (Emphasis in original). This conclusion for Teegarden should apply equally to Rogers.

A "reasonable person" must know "or should have known" that the "injury was related to employment." NDCC 65–05–01. When the injury is "[a]ny disease which can be fairly traceable to the employment," that knowledge must comprehend that "the disease follows as an incident to, and in its inception is *caused* by a hazard to which an employee is subjected in the course of his employment." NDCC 65–01–02(8)(a)(1). (My emphasis). Understanding the causes, effects, and implication of an insidious disease is complex enough for professionals, (physicians, lawyers, and judges alike), without attributing equivalent comprehension to an ordinary worker.

Without more compelling evidence of Rogers' understanding (not that of Dr. Hughes), I believe that it is unreasonable to conclude that Rogers knew, or should have known, that he had to file a workers' compensation claim in 1988 when his symptoms first showed up. Compare Rogers' single episode with *Teegarden's* extensive history of excused symptoms:

Virgil E. Teegarden, the claimant and the appellant, started work in 1967 with the Hunter Grain Company in Hunter, North Dakota. Hunter Grain Company owns two elevators in Hunter, and Teegarden started work at a feed mill at one of the elevators. In February 1969, he began to have lung problems along with some pleurisy and pneumonia. He was treated as an outpatient for two weeks but was subsequently hospitalized for a period of time. In March of 1969 he had wheezes and rales of the left lower lung for which

he was treated and which took approximately two weeks to clear. At this time he was advised by his doctor, Dr. R.W. McLean of Hillsboro, North Dakota, to avoid dust and to quit smoking. Teegarden transferred out of the feed mill to another job at the elevator where he continued to do general elevator work including delivering feed, loading trucks, and dumping grain. In May of 1969 he was again treated for tightness in his chest and bronchitis. The claimant was again treated for pneumonia and pneumonitis in December of 1970. In October 1973 he fractured three ribs and developed pneumonitis which required lengthy hospitalization. In April 1974, February 1975, and twice in September 1975, he was treated for bronchitis. He was again treated for bronchitis in May of 1976, February 1977, February 1978, January 1979, and June 1979. In October 1979 he was hospitalized with pneumonia. He was treated for bronchitis in November and December of 1979, and again in February and March 1980. In April of 1980 he was hospitalized with bronchitis. At that time Dr. McLean told Teegarden that he could no longer return to his employment at the elevator because of the sensitivity to dust. Dr. McLean informed Teegarden that he had a compensable claim with the Bureau.

On 29 May 1980 Teegarden filed a claim with the Bureau stating that his respiratory problems were due to constant exposure to grain dust during the course of his work at the elevator.

*Teegarden*, 313 N.W.2d at 717. Teegarden's knowledge of symptoms from grain dust spanned a decade before he sought workers' benefits. Rogers' single episode contrasts with that.

Compare, as well, what Dr. Hughes says that he told Rogers in 1988:

"A. (Dr. Hughes) I did not tell him that he had to leave the environment at that time. I told him that it was advisable not to be there, but I did not tell him that he had to leave. I was negotiating for a lower level of exposure. My understanding of his job was that he was doing office activi-

ties, he wasn't involved in the off loading or loading of grain, and that it might be possible for him to limit his exposure and still be employed."

"So I did not—did not come down heavily on him with the idea that I'm going to—as I think about it, I remember being back in that situation asking it—you know, pondering the question as to whether he needed to—he and his wife needed to see the change in lifestyle, you know, necessary to make the switch to not be working anymore. And I remember having an element of flexibility in there, saying that if he was to lower his exposure, he would—he would benefit from that."

\* \* \* \* \* \*

"A. So I think it's a cofactor and a significant cofactor in his illness. And it's—you know, the progression of symptoms in emphysema are insidious and characterized by shortness of breath on exertion and frequently rationalized on the part of the patient as part of aging or just denying so that they gradually diminish their level of exertion, saying that they really don't have much of a problem, and they continue with the exposures that put them at risk. So it's between—you know, once you get below 40 percent of predicted that they start to get coerced into seeking medical attention, recognizing a problem."

\* \* \* \* \* \*

"Q. (Mr. Haas) And that's—Doctor, that's something that you'd been telling him back in July of '88; namely, that his employment was a substantial factor in his lung problems; right?"

"A. (Dr. Hughes) The initial thing that I was focusing on was his tobacco use, and that I felt that he should"—

"Q. But one of the things, Doctor, that you told him was that his employment was a substantial factor in his diminished lung function; isn't that right?"

(Witness examines documents.)

"A. The emphasis—my concern at the time was—was that the tobacco was the major problem."

\* \* \* \* \* \*

"A. (Dr. Hughes) And so I can't be sure how effectively I transmitted my feelings at the time. I may have transmitted them more effectively in print than I did verbally with the patient."

"Q. (Mr. Little) By print you're referring to"—

"A. My dictation."

\* \* \* \* \* \*

"Q. But would he be in a position that if he was exposed to small amounts of grain dust that he might have problems?"

"A. Yeah, he might. But, again, the—I think in trying to reconstruct what was in my mind on July 27th of '88, I'd have to point out that his spirometry had actually been improving at that point, and rather significantly, suggesting that part of what we're dealing with was reversible airway obstruction."

"Now, generally, were this asthma or the severity, as opposed to emphysema, well, I guess, in all honesty, I tend to be fairly blunt in recommendations which I expect to be difficult to follow-up on."

\* \* \* \* \* \*

"A. Well, my primary concern was his tobacco use. And I guess it's so hard for people to quit smoking that I do have a tendency to use levers in terms of the long-term goal. The long-term goal in him necessitated that he quit smoking. That's the number one priority. It necessitated that he—implied that he probably should leave work, as well, as a secondary goal."

"Now, I am a bit of an opportunist at times when it comes to tobacco, and I may simply have left him with the impression that if he were to quit smoking he might be able to continue working, because it was—it was urgently important to get him off tobacco."

\* \* \* \* \* \*

"A. Yeah. We had seen a significant improvement in his breathing test, indicating that he had a reversible component. And I, at that point, was impressed by the fact that he had responded to treatment, and that that probably did play a role in my communication with him at that time. Now, if we had seen a lack of improvement with treatment and a further decline, it would have been—I would have been more likely to be hard-nosed in talking to him about"—

\* \* \* \* \* \*

"A. Well, you know, I think, as I look through the record and as I remember, his alpha¹-antitrypsin level was not—as I said, I inherited him from another physician, but his alpha¹-antitrypsin level was not measured until April of 1990. So the implications for him in dust exposure amplified dramatically with that knowledge. April 5th of 1990 is the first alpha¹-antitrypsin level that I see in the chart."

"Q. Okay."

"A. So I'm sure that—that that knowledge, being new at that point, was the reason that the nature of the communication changed."

\* \* \* \* \* \*

"A. 1990 was where—April of 1990 was when we first actually did the test to document that he had alpha¹-antitrypsin deficiency. And I believe the reason we did the test was because we, at that point in time, had documented interval decline in lung function, that it was occurring at enough of a rate to begin to suspect that that might be a problem."

"His emphysema was getting worse and that raised some concern about—the time course of that change raised concern about the possibility of alpha¹-antitrypsin deficiency. Really, we should have done the test earlier than we did, but I'm sure that the knowledge that that—I mean, the knowledge of that in 1990 dramatically changed that nature of the communication, because that—and I, I should have brought that up earlier, I didn't really think about it. But looking at it in prospective now, once we became aware of that, that's when the heat really went up on the issue of him leaving work. And it was subsequent to that Dr. Mendoza saw him and gave him that blunt assessment that he had to leave."

\* \* \* \* \* \*

"Q. And so when you say that the nature of communication changed, you mean you're stressing more to him that it was imperative to leave it after you knew that he had a genetic predisposition toward emphysema because of that deficiency?"

"A. Yeah. It's, I suppose, a difference between having an oily rag stored in your garage and seeing smoke come out the window. The degree of urgency was greatly amplified by the knowledge that—that he had alpha$^1$-antitrypsin deficiency."

"I, you know, in trying to think back to the interaction we had in July of '88, I'm sure that I—that I indicated to him that his job was a problem and that we had to modify the work exposure, and that the urgency then was his smoking and that we needed to get him to quit smoking."

"The subsequent clinic visits do much more—much much more to address the issue of smoking than they do to address the issue of his working up until he actually quit smoking. And it wasn't going to do this gentleman any good to quit work only to go home and smoke more."

Because I believe that this testimony shows that Rogers' claim is controlled by the *Teegarden* precedent, I would reverse.

Therefore, I respectfully dissent.