STATE of North Dakota, Plaintiff
and Appellant,

v.

Hugh P. NELSON, Defendant
and Appellee.

Cr. No. 910327.

Supreme Court of North Dakota.

June 25, 1992.

James A. Hope (argued), Asst. States Atty., Dickinson, for plaintiff and appellant.

Freed, Dynes, Reichert, Buresh & Herauf, PC, Dickinson, for defendant and appellee; argued by Eugene F. Buresh.

MESCHKE, Justice.

The State appeals the dismissal of a criminal charge against Hugh Nelson for driving while under the influence of alcohol. Because the trial court mistakenly ruled that the stop was unreasonable, we reverse.

In December 1990, Nelson attended a dance at the Hall in South Heart, North Dakota. Deputy Sheriff Terry Oestreich and Detective Larry Buck were policing there that night. Buck, who knew Nelson, saw him in the Hall bar early that evening. Later, Buck said, he saw Nelson walking in the parking lot next to the Hall. The two men had no verbal exchange. Buck said that he walked past Nelson, saw Nelson swaying as he walked, and believed that Nelson was intoxicated.

Near this same time, Deputy Oestreich drove past the parking lot and saw a man walking. Oestreich testified that he noticed the man staring off into space and swaying as he walked. Oestreich believed that the man appeared intoxicated.

When Buck came to his vehicle, he radioed Oestreich. Oestreich reported that he had seen a tall man walking who was wearing a black-leather jacket and jeans. Buck told Oestreich that the man was Nelson. Buck also told Oestreich that Nelson had entered a red and white, extended-cab, Ford pickup, and agreed that Nelson appeared intoxicated.

Detective Buck watched the pickup for awhile before Nelson backed up and drove out of the parking lot. Buck radioed Deputy Oestreich that Nelson's pickup was leaving. Oestreich stopped Nelson immediately as he left the parking lot. Oestreich testified that Nelson did not violate any traffic law and that Nelson's driving did not suggest intoxication. Rather, Oestreich based the stop on the dispatch from Buck and on his own brief observation of Nelson walking in the parking lot.

At the stop, Oestreich asked Nelson to perform several field sobriety tests. Nelson performed most of the tests adequately, but did poorly on the nystagmus gaze test and failed an A.L.E.R.T. test. Oestreich arrested Nelson for driving while under the influence of alcohol. *See* NDCC 39–08–01.[1] An intoxilyzer test and a blood test both showed that Nelson's blood alcohol content exceeded 0.10 percent alcohol.

Nelson pleaded not guilty and, claiming an illegal stop, he moved to suppress the test results and to dismiss the charge. After a hearing, the trial court held that the officers' information was not enough for an articulable and reasonable suspicion that Nelson may have been violating any traffic law. The court ruled that, if Nelson were as badly inebriated as Buck reported, he should have detained Nelson pursuant to NDCC 5–01–05.1 before letting him drive.[2] The court declared that it was

---

1. The pertinent part of NDCC 39–08–01 says:
   1. A person may not drive or be in actual physical control of any vehicle upon a highway or upon public or private areas to which the public has a right of access for vehicular use in this state if any of the following apply:
   a. That person has a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the perform-
   
   ance of a chemical test within two hours after the driving.
   b. That person is under the influence of intoxicating liquor.
   
   \*   \*   \*   \*   \*   \*

2. NDCC 5–01–05.1 says:
   *Public intoxication—Assistance—Medical care.*
   A peace officer has authority to take any apparently intoxicated person to his home, to a local

"unbelievable" that an officer would allow an "apparently intoxicated person" to drive and to create a danger to himself and others. Therefore, the court concluded that the stop was unreasonable under the Fourth Amendment, suppressed the evidence, and dismissed the charge.

■ The State appeals from the order of dismissal. In *State v. Ritter*, 472 N.W.2d 444, 447 (N.D.1991), we held that, under NDCC 29–28–07(1), we have authority to review an appeal from the dismissal of a criminal charge. "This court has previously held that an order dismissing a criminal complaint is equivalent to the quashing of a complaint, and thus orders dismissing complaints are appealable under Section 29–28–07(1)." *State v. Melin*, 428 N.W.2d 227, 231 (N.D.1988) (citations omitted). We are authorized to review this dismissal.

The State argues that, from the information relayed by Buck, Deputy Oestreich did have an articulable and reasonable suspicion to stop Nelson. The State submits that the trial court misconstrued Buck's testimony, and that the court was mistaken in holding that Buck should have detained Nelson for public drunkenness rather than let him drive. In any event, the State asserts, Oestreich's own glimpse of Nelson walking unsteadily was enough reason for the stop.

■ Police may briefly stop an auto to investigate a reasonable suspicion that a driver may be violating a law, without waiting for an actual violation or an actual injury to someone. *State v. Bryl*, 477 N.W.2d 814, 817 (N.D.1991). An officer need only have enough information for an articulable and reasonable suspicion that the driver has or may be violating the law. *Id.* at 816; *State v. Neis*, 469 N.W.2d 568, 569 (N.D.1991). The information of the stopping officer need not arise from per-

sonal observation alone. *Bryl* at 816. Reasons for the suspicion may also come from another person or officer. *Id.* The collective information of law enforcement personnel, known by or transmitted to the stopping officer, must be considered to assess whether a stop is reasonable under the Fourth Amendment. *State v. Rodriguez*, 454 N.W.2d 726, 729 (N.D.1990). These Fourth Amendment signposts guide us here.

■ On review, we recognize the trial court's superior position to assess the demeanor and credibility of the witnesses, and we defer to that court's factual determinations about searches and seizures, unless those factual determinations are contrary to the manifest weight of the evidence. *Bryl*. See also *State v. Pickar*, 453 N.W.2d 783, 785 (N.D.1990); *State v. Morrison*, 447 N.W.2d 272, 275 (N.D.1989); *State v. Frank*, 350 N.W.2d 596, 599 (N.D. 1984). As an appellate court, we do not usually resolve conflicts in the evidence, determine the credibility of explanations, or weigh the evidence.

■ The trial court said that the testimony of Detective Buck was suspect.

Deputy Oestreich stopped [Nelson's] vehicle on main street in South Heart and freely concedes that [Nelson] had committed no moving or equipment violations which would warrant a violation or investigatory stop.

\*　　\*　　\*　　\*　　\*　　\*

Officer Buck testified that he knew [Nelson], saw him in the bar drinking, that it was very obvious that he was intoxicated, and he was amazed that [Nelson] got into that pickup. After he got into the pickup, according to Deputy Buck's testimony, [Nelson] sat there for a long time.

hospital, or, whenever such person constitutes a danger to himself or others, to a jail for purposes of detoxication. A duly licensed physician of such local hospital has authority to hold such person for treatment up to seventy-two hours. Such intoxicated person must not be held in jail because of intoxication more than twenty-four hours. An intoxicated person must not be placed in a jail unless a jailer is constant-

ly present within hearing distance and medical services are provided when the need is indicated. Upon placing such person in a hospital or jail, said peace officer shall notify the intoxicated person's family as soon as possible. Any additional costs incurred by the city or county on account of an intoxicated person shall be recoverable from such person.

This testimony is suspect. If indeed [Nelson] was as intoxicated as Deputy Buck testified to, certainly the deputy would have invoked NDCC 5–01–05.1 which permits a peace officer to take any apparently intoxicated person to his home, to a local hospital, or, in some cases, to jail. It is not believable that a Stark County peace officer would permit an "apparently intoxicated person" to drive off in an automobile thus creating great risk to the motoring public as well as the county insurers. If [Nelson] had displayed the manifestations of intoxication to which the deputy testified, the deputy had ample opportunity as well as the duty to prevent [Nelson] from leaving the parking lot behind the wheel of an automobile.

The court thus applied the statute, at n. 2 above, that authorizes an officer to assist a public drunk, as a command that an officer detain the drunk before he gets into an auto. For that legal reason, the court refused to consider Buck's testimony.

Accordingly, the trial court stated: "Officer Oestreich testified that he observed nothing connected to [Nelson's] driving which would justify an investigative stop. That testimony leaves the State bereft of [reasonable] cause to stop [Nelson's] vehicle." Having rejected Buck's testimony, the court reasoned that Oestreich's remaining information was inadequate. We conclude that the trial court was mistaken in both respects.

From Buck's identification of Nelson as the person Oestreich saw walking unsteadily, besides Buck's added description of Nelson's inebriated state, Oestreich had a reason to stop Nelson. In *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the United States Supreme Court summarized this view that requires consideration of the collective information communicated among fellow officers.

> Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the investigating officer to rely on fellow officers to make the arrest.

*Whiteley* at 568, 91 S.Ct. at 1037. In *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court extended this concept to an investigatory stop, explaining that

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, ... to pose questions to the person, or to detain the person briefly while attempting to obtain further information. *See Adams v. Williams*, 407 U.S. 143, 146 [92 S.Ct. 1921, 1923, 32 L.Ed.2d 612] (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time"). If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit. It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it. Assuming the police make a *Terry* [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, ... and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

*Hensley* 469 U.S. at 232–233, 105 S.Ct. at 682. [Some citations omitted]. Further,

quoting an apt explanation by the Ninth Circuit Court of Appeals, *Hensley* clarifies that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.

*Hensley* at 231, 105 S.Ct. at 682. *See also* 1 Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 3.3(e) (1984). Although we are concerned with a reasonable and articulable suspicion for a stop, not probable cause for the arrest, *Hensley* teaches us that the reason for a stop can be based on information communicated by a fellow officer.

■■■■ Here, the trial court reasoned that Detective Buck should have detained Nelson sooner. If this rejection of Buck's testimony was a credibility determination, we believe that it was made for an improper reason. A trial court cannot effectively shield its decision from appellate review by expediently declaring a key witness's testimony not credible. *See Bergstrom v. Bergstrom*, 296 N.W.2d 490, 494 (N.D. 1980) (By arbitrarily finding that each one of a party's witnesses lacked credibility, a trial court cannot forestall effective review); *Gardebring v. Rizzo*, 269 N.W.2d 104, 109 (N.D.1978) ("[T]he trier of fact can [not] arbitrarily disregard the testimony of experts, or for that matter, the testimony of any witness."). *See also Matter of Estate of Zent*, 459 N.W.2d 795, 799 (N.D. 1990); *Mansukhani v. Pailing*, 318 N.W.2d 748, 751 (N.D.1982). While credibility of witnesses is normally the province of the trial court, a trial court cannot disregard testimony that is uncontradicted and unchallenged where no basis for doing so appears in the record. *Apolskis v. Concord Life Ins. Co.*, 445 F.2d 31 (7th Cir. 1971). Buck's testimony was uncontradicted, and the information that he transmitted was reasonably relied on by Oestreich to stop Nelson.

The trial court did not directly declare Buck's information unreliable for the usual credibility reasons. Rather, the court concluded that Buck should have detained Nelson at once, rather than letting him drive. This conclusion was made without any basis in the record or in the law. There was no testimony about what a reasonable police officer would have done in the circumstances. The trial court's conclusion was based on an arbitrary reason.

■■■■ At a dance in a small town, there may be many reasons why persons will leave a dance and go to their auto—for rest, for an amorous purpose, for more alcohol, or for illness from alcohol already consumed, among others. Those persons do not always intend to drive away. Therefore, we do not agree that an officer who sees an intoxicated person go to an auto should always detain that person immediately, or that a failure to do so makes the officer's information unreliable when transmitted to a fellow officer.

At some dances, the officer would have neither time nor ability to detain every person who went to an auto in an apparently inebriated condition. Buck's testimony on cross-examination illustrates:

Q. If he was so obviously intoxicated, why did you allow him to get into a vehicle?

A. There's many kids and people that leave that hall, go out and sit in their vehicles for a while, and then go back into the hall. We'd be spending the whole night out there running people out of their vehicles if we did that.

Where another officer is available to stop a person who goes to an auto if he attempts to drive, prompt detention of that person would be neither wise nor necessary. Traffic on a street in a small town is not usually congested, so any danger to others in the brief time before a stop would be minimal.

While we might agree that an officer should, when fairly possible, seek to prevent an inebriated person from driving, we cannot conclude, from the officer's inaction itself, that his information is unreliable. Buck's communication, as well as Oestreich's own observation, gave Oestreich enough reason to make a brief investigato-

ry stop. After the stop, Oestreich found probable cause for the arrest.

Because we believe the trial court mistakenly ruled that the investigatory stop was unreasonable, we reverse the order suppressing the tests and dismissing the charge. We remand for trial.

ERICKSTAD, C.J., VANDE WALLE, J., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice JOHNSON, not being a member of this Court at the time this case was heard, did not participate in this decision.

LEVINE, Justice, dissenting.

This is not an easy case. I, too, may have found the police officers' testimony credible, had I been the fact finder. But that is not the standard of our review. I, therefore, dissent.

It requires no citation that the trial court is the ultimate arbiter of credibility. Of course, all credibility determinations are part of the record and subject to our review. But still, the fact finder is perfectly justified to reject anyone's testimony if it finds that testimony lacking in credibility. That finding of incredibility need not be articulated but, instead, is often inferred from the fact finder's decision. *E.g., Becker v. Becker*, 262 N.W.2d 478 (N.D.1978). The majority says that a trial court cannot disregard testimony that is uncontradicted and unchallenged. But that is not the law in North Dakota or at least has not been the law in North Dakota until now. *City of Fargo v. Candor Const.*, 260 N.W.2d 8 (N.D.1977); *Waletzko v. Herdegen*, 226 N.W.2d 648 (N.D.1975). When the basic facts or evidence are not disputed, the trial court is not required to make a credibility determination. *E.g., In Interest of Riedel*, 353 N.W.2d 773 (N.D.1984). That is so because if the trial court finds in favor of the position espoused or supported by the witness, we assume the trial court has implicitly found the testimony that witness to be credible, while if there is a determination contrary to the witness' position, we assume the opposite. *E.g., Becker v. Becker, supra.* We have held that when a witness has an interest in a question at issue, his or her uncontradicted testimony need not be accepted by the fact finder. *Farley v. Champs Fine Foods, Inc.*, 404 N.W.2d 493 (N.D.1987). I would say that these police officers had a good deal of interest in the question at issue.

I agree that a fact finder may not reject a witness' testimony for an arbitrary reason. *Gardebring v. Rizzo*, 269 N.W.2d 104 (N.D.1978). "Arbitrary" means capricious or irrational. Webster's Third New Int'l Dictionary (1971). We all agree that if a witness appeared jittery, or coached, averted his or her eyes or exhibited other clues that do not appear in the "cold" record (but are the reason for the rule that this court has no authority to secondguess credibility determinations), a finding of lack of credibility based upon any of those reasons would not be arbitrary. I am unable to rationalize the distinction between a fact finder's intuition and reaction, almost always unarticulated, to a witness' physical appearance and demeanor on the one hand and, on the other hand, the fact finder's intuition and reaction to the witnesses' demeanor and testimony about their reasonable suspicion to stop defendant's vehicle. Obviously, the majority disagrees with the reason given for the trial court's rejection of the police officers' testimony. All that tells me is that the majority would have weighed that evidence differently if it had been given that opportunity. But the fact that police officers sit back and watch a drunk get into a vehicle is certainly a factor that may be considered by the fact finder on the issue of whether there was evidence of intoxication sufficient to constitute reasonable suspicion, is it not? How, then, can it be arbitrary for the fact finder to have given that factor weight? It seems to me it was considered and weighed by the fact finder in accord with the fact finder's prerogative.

I would affirm the dismissal of the criminal charge.