Timothy T. GROTTE, Appellant,

v.

NORTH DAKOTA WORKERS'
COMPENSATION BUREAU,
Appellee,

and

Phillips Petroleum Company, Appellee.

Civ. No. 920048.

Supreme Court of North Dakota.

Aug. 19, 1992.

Schulte & Enget, Stanley, for appellant; argued by Jonathan R. Byers. Appearance by Timothy T. Grotte.

Dean J. Haas (argued), Asst. Atty. Gen., North Dakota Workers' Compensation Bureau, Bismarck, for appellee North Dakota Workers' Compensation Bureau.

Pearce & Durick, Bismarck, for appellee Phillips Petroleum Co. Submitted brief. Michael F. McMahon (appearance).

ERICKSTAD, Chief Justice.

Timothy Grotte appealed from a district court judgment affirming the dismissal of his claim for benefits by the North Dakota Workers Compensation Bureau, because the claim was untimely filed. We affirm.

Between October 1985 and July 1988, Grotte worked as a field technician for Phillips Petroleum Company (Phillips). Grotte's job required him to work around chemicals that irritated his lungs. In June 1987 Grotte was hospitalized with lower right lung pneumonia with pleurisy. Grotte's lung condition improved until he resumed working. On November 23, 1987, Grotte's doctor advised him that his lung condition was attributable to and aggravated by the chemical fumes that he was exposed to at the workplace. Each time that Grotte would take sick leave, thereby removing himself from the chemical environment at work, his condition would clear. Grotte was "laid off" his job with Phillips in July 1988. His lung problems did not

reoccur until he resumed work in March 1989 with another company, where he once again worked in the oil fields around chemicals.

On May 17, 1989, Grotte filed a claim with the Bureau for benefits relating to his lung condition. The Bureau denied Grotte's claim on the ground that it was not timely filed. Grotte appealed to the district court, which affirmed the Bureau's dismissal, and Grotte then filed this appeal.

■ Section 65–05–01, N.D.C.C., specifies the time period within which an injured worker must file for workers compensation benefits:

> "All original claims for compensation must be filed by the injured worker ... within one year after the injury.... When the actual date of injury cannot be determined with certainty the date of injury must be the first date that a reasonable person knew or should have known that the injury was related to employment."

Under this statute the period for filing a timely claim for an injury whose date of occurrence is uncertain "begins on the first date that a reasonable lay person, not learned in medicine, knew or should have known that the injury was related to his or her employment." *Evjen v. North Dakota Workers Compensation Bureau*, 429 N.W.2d 418, 420 (N.D.1988). The Bureau determined that the one year limitation period began to run in November 1987, and that Grotte's May 1989 claim was untimely. Grotte asserts on appeal that the Bureau's conclusion is wrong, because the Bureau made no specific finding that Grotte knew or should have known that he had a "compensable" injury in November 1987.

In *White v. North Dakota Workers Compensation Bureau*, 441 N.W.2d 908, 910 (N.D.1989), we held that Section 65–05–01, N.D.C.C., "requires knowledge of a compensable injury to begin the period for filing a claim." The Bureau found that Grotte "reasonably knew the work relatedness of his condition in November of 1987." Implicit in that finding is that Grotte knew he had a compensable injury by November 1987. Although the Bureau does not specifically refer to the term "compensable" in its findings, Grotte cannot seriously argue that his condition was not compensable by November 1987. He did not make any such argument before the Bureau or the district court. The record evidence is undisputed that by November 1987 Grotte had received medical treatment for his lung condition and had missed a considerable amount of work because of his condition. The evidence also reveals that Grotte had used so much sick leave that he began receiving only partial payments for days missed and that Grotte was aware, by November 1987, that workers compensation benefits could have provided him with more pay than the partial sick leave payments he was receiving from his employer.

Grotte relies upon *Teegarden v. North Dakota Workmen's Compensation Bureau*, 313 N.W.2d 716 (N.D.1981), to support his argument that he did not have reason to know that he was suffering a compensable injury in November 1987. In *Teegarden*, the claimant worked at a grain elevator. He developed respiratory problems, and in 1969 his doctor advised him to avoid dust and to quit smoking. Teegarden filed a claim for benefits with the Bureau in 1980, asserting that his respiratory problems were due to his consistent exposure to grain dust at work. The Bureau denied his claim on the ground that it was not filed within one year after he knew or should have known that his respiratory problems were related to his job. We reversed the Bureau's dismissal of Teegarden's claim, stating:

> "The Bureau made no specific finding of fact as to when the claimant knew or should have known that his disability was fairly traceable to his employment, nor are we aware of any evidence that establishes this fact. The evidence establishes that the physician advised only that the claimant was to avoid dust and to quit smoking, but does not otherwise establish any basis that claimant should have known that the work caused the disease.

\* \* \* \* \* \*

"The record contains no evidence of facts indicating that the claimant was informed by anyone that the injury or disease was caused by or was work-related, nor is there any evidence that a worker comparable to the one in question here under the conditions of employment should have known that his injury or disease was caused by work or was work-related."

*Teegarden, supra,* 313 N.W.2d at 719.

We disagree with Grotte that as of November 1987 he, like the claimant in *Teegarden, supra,* did not have reason to know that he had a compensable work-related injury. Grotte's own testimony belies that assertion:

"I had bronchitis, asthma, and a burning sensation in the lungs, especially when I was close to any chemical fumes or large amounts of hydrogen sulfide gas at work. Hydrogen sulfide gas, corrosion chemicals, and just the smell of the oil itself was irritating me whenever I got around large amounts.

\*　\*　\*　\*　\*　\*

"[W]henever my respiratory problem flared up, I always kept in close contact with my physician and he related that the respiratory problems were the— (inaudible.)

"MR. HAAS: That they were related to your work?

"THE WITNESS: Yes, Sir.

"Q. When did he first relate this to you?

"A. He suspected probably, I would say, probably in July or August of 1987, and then on a visit with him in November of 1987 he definitely stated that it was work related. And it is documented in my medical records."

By November 1987, Grotte had received medical treatment for his lung condition, had missed numerous work days because of that condition, and had been informed by his doctor that the condition was work-related. Consequently, Grotte's circumstances are distinguishable from those in *Teegarden, supra,* where there was no evidence that the claimant was ever told by his doctors that his respiratory condition was attributable to his job, rather than factors also found outside the workplace, such as dust and cigarette smoke.

The circumstances here are similar to those in *Rogers v. North Dakota Workers Compensation Bureau,* 482 N.W.2d 607 (N.D.1992) (Meschke, J., dissenting), where we upheld the Bureau's conclusion that a claim was untimely filed. We agreed with the Bureau that the claimant should have known that he had a compensable work-related injury when his doctor informed him that the grain dust environment at his workplace was a factor contributing to his lung disease.

On appeal, we review an agency's findings of fact to determine whether they are supported by a preponderance of the evidence. Section 28–32–19, N.D.C.C. In reviewing the agency's findings we do not make independent findings of fact or substitute our judgment for that of the agency. *Stepanek v. North Dakota Workers Compensation Bureau,* 476 N.W.2d 1 (N.D.1991). We only determine whether a reasoning mind could reasonably have determined that the factual conclusions reached were proved by the weight of the evidence. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979). We conclude that the Bureau's finding that Grotte failed to file a timely claim within one year from the date he knew or should have known that he had a work-related injury is supported by a preponderance of the evidence.

■ Grotte also asserts on appeal that the Bureau should be estopped from asserting that his claim was untimely filed, because Grotte's employer, Phillips, discouraged him from filing a claim. The Bureau responds that an employer's conduct, however egregious, cannot constitute grounds to estop the Bureau from asserting the statute of limitations under Section 65–05–01, N.D.C.C. The Bureau found that Phillips did not discourage Grotte from filing a claim. We need not determine whether or not an employer's wrongful conduct, which prevents an employee from filing a timely claim, can estop the Bureau from asserting that the claim was untimely filed, because

we conclude that the Bureau's finding is supported by a preponderance of the evidence.

In support of his estoppel argument, Grotte asserts that his supervisor, LeRoy Sandberg, told Grotte on more than one occasion that he should not file a claim or did not need to file a claim because Phillips' health insurance and sick leave benefits adequately compensated him. Sandberg denied making any comments to either encourage or discourage Grotte from filing a claim for workers compensation benefits. The Bureau made the following specific findings regarding this issue:

"[T]here is insufficient evidence in this record that Sandb[e]rg in fact induced claimant not to file a timely application for workers compensation benefits in any way.

\* \* \* \* \* \*

"It appears that claimant was satisfied with receipt of sick leave and insurance to cover his expenses. Factually this case seems to present more of an excuse for not filing a claim on the grounds that claimant was unaware of the severity of the injury. Such is not an excuse for late filing of a claim.

\* \* \* \* \* \*

"In regard to whether the claimant or Sandberg is telling the truth concerning any misrepresentations that Sandb[e]rg may have made, it is relevant to note that claimant has had other disputes with Sandberg wherein he had confronted and/or proceeded up the chain of command in an attempt to overrule Sandb[e]rg. It is difficult for claimant to explain why he did not seek counsel from higher authorities in these circumstances for filing a workers compensation claim. Moreover, claimant has actually filed a workers compensation claim for an injury to his ribs in the Spring of 1988. This other filing appears to contradict his assertion that he dared not file a claim for workers compensation for fear it would somehow be held against him by Phillips.

\* \* \* \* \* \*

"I do not find the facts sufficient to conclude that Sandb[e]rg actually made any representation to the claimant concerning his remedy for filing a workers compensation claim."

Grotte disputes the Bureau's findings that Grotte's supervisor did nothing to discourage Grotte from filing a claim. Our inquiry is whether or not those findings are supported by a preponderance of the evidence or, more specifically, whether or not a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. *Rogers v. North Dakota Workers Compensation Bureau*, 482 N.W.2d 607 (N.D.1992). In conducting that review we do not make independent findings of fact or substitute our judgment for that of the agency. *Stepanek v. North Dakota Workers Compensation Bureau*, 476 N.W.2d 1 (N.D. 1991).

It is within the Bureau's province to weigh the credibility of the evidence presented. *Latraille v. North Dakota Workers Compensation Bureau*, 481 N.W.2d 446 (N.D.1992). The Bureau has the responsibility and duty to pass on the credibility of witnesses appearing before it, including the claimant, and to weigh the evidence and make findings on disputed questions of fact. *Risch v. North Dakota Workers Compensation Bureau*, 447 N.W.2d 308 (N.D.1989). Although the Bureau cannot rely upon inconsistent "medical evidence" favorable to the Bureau's position without attempting to clarify the inconsistencies in that medical evidence [*e.g., Moses v. North Dakota Workers Compensation Bureau*, 429 N.W.2d 436, 438–439 (N.D.1988)], the credibility of non-expert witnesses is primarily within the Bureau's purview, without ranking credibility or clarifying inconsistencies in their testimony. *Schaefer v. North Dakota Workers Compensation Bureau*, 462 N.W.2d 179 (N.D.1990).

Grotte submitted testimonial evidence that Sandberg discouraged and intimidated him from filing a timely claim. Sandberg

adamantly denied that he did anything to discourage Grotte from filing a claim:

"Q. Have you ever made a suggestion to an employee that he either file or not file a workmen's compensation claim?

"A. No, Sir. I did not think it was my duty. We had administrative people that took care of that. And also, it's the employee's responsibility to take the form and get it filled out. So I did not—or have I ever mentioned anything as far as workmen's compensation to the employee.

\*  \*  \*  \*  \*  \*

"Q. Now, didn't you specifically tell Tim Grotte that he should not file a workers compensation claim for his respiratory problems because the sick leave benefits and the insurance benefits provided by Phillips Petroleum were there to take care of that problem?

"A. I did not.

\*  \*  \*  \*  \*  \*

"Q. Didn't you tell Tim sometime in the winter of '87 or early winter of '88 that you didn't think there were enough facts to show that his lung problems were attributable to his work with Phillips?

"A. No, I did not.

\*  \*  \*  \*  \*  \*

"Q. As I understand it, it's your testimony that you never talked to Tim about workers compensation in any form, fashion, or manner at any time?

"A. Not to my knowledge.

"Q. As I understand your testimony, that Tim never asked you at any time about whether or not he should or could file a workers compensation claim?

"A. No, Sir."

Keeping in mind that it is the Bureau's responsibility to assess credibility, we conclude that a reasoning mind could have reasonably found that Grotte's employer did not discourage Grotte from filing a workers compensation claim nor mislead him into filing an untimely claim. In view of that finding, Grotte's estoppel argument is without merit.

In his dissent, Justice Meschke asserts that this case parallels our decision in *White, supra,* and urges that we conclude, as we did in *White,* that the Bureau erred in dismissing the claim for benefits because it was untimely. *White* is distinguishable from the facts in this case. The claimant in *White,* a custodian at a hospital, fell down a flight of stairs at work. White's supervisor discouraged him from filing a claim, and White's doctor diagnosed his back pain after the fall as arthritis caused by aging. Two years after White fell down the stairs, a neurosurgeon connected his back pain with the fall, diagnosing White's problem as a herniated disc. After that diagnosis, White filed a workers compensation claim. We concluded that the claim was timely, because White could not have reasonably known that his back pain was related to his fall until the neurosurgeon's diagnosis.

In this case, Grotte's doctor told him that his lung condition was attributable to his exposure to chemicals at the workplace. Grotte did not file a workers compensation claim until about one and one-half years after the doctor had advised him that his condition was work related.

In dissent, Justice Meschke states that Phillips' policy of paying benefits to workers who are absent because of an injury is consistent with Grotte's testimony that the company discouraged him from filing a claim for workers compensation benefits. Grotte does not rely upon the company policy to support his arguments on this appeal. There is good reason that he does not rely on it. Phillips' policy demonstrates that the company had a monetary incentive to encourage employees to file timely workers compensation claims, and for that reason, the company policy is consistent with the testimony of Grotte's supervisor that he did not discourage Grotte from filing a timely claim. Phillips' policy states, in relevant part:

"If your worker's compensation payments ... are less than the amounts shown in the schedule of benefits for your sickness or injury ... partial on-job disability benefit payments will be made.

These payments will be in such amount as is necessary to bring the total benefit you receive up to the proper amount shown in the schedule."

Under this provision Phillips agreed to pay the difference between the amount of workers compensation benefits received by an employee and the schedule of benefits provided under Phillips' compensation policy. Phillips thus had a monetary incentive to encourage employees to obtain workers compensation benefits, thereby reducing or eliminating Phillips' payments to the injured employee.

Justice Meschke states that Grotte "had no permission" from Phillips to file a workers compensation claim while he received Unavoidable Absence Benefits (UAB). Justice Meschke puts a more expansive interpretation on Phillips' personnel policy than is warranted. That policy does not require an employee to seek permission from Phillips before filing a workers compensation claim. It merely states that when workers compensation benefits are or may be payable the matter must be referred to Phillips' claims office "before UAB payments are made." The sole purpose under the policy for having the employee submit workers compensation matters to Phillips, is to have its claims office compute the amount of UAB the worker is entitled to receive from Phillips. Phillips' policy cannot delegate to its claims office the right to determine workers compensation claims, because that authority rests exclusively with the Bureau. Section 65–05–03, N.D.C.C.

Justice Meschke writes in dissent that, "No company action was taken about a workers' compensation claim." However, by statute the injured employee, not his employer, has the responsibility for filing a workers compensation claim. Section 65–05–01, N.D.C.C.

The Phillips' policy does state that the claims office will determine "the amount, if any, of worker's compensation benefits payable." When read in context, that sentence means the claims office will compute workers compensation payments for the sole purpose of determining the amount of employee benefits that Phillips must pay. It does not mean that the claims office will usurp the Bureau's authority to handle workers compensation claims. When read out of context, the policy provision arguably could confuse an employee into believing that Phillips would make a determination on workers compensation claims, but Grotte does not argue that he was confused by this provision. He does not assert that the policy misled him in any way from filing a timely claim with the Bureau. Instead, his only argument is that his supervisor discouraged him from filing a timely claim. That is a fact question, and the factfinder, on disputed evidence, decided the question against Grotte.

Justice Meschke and Justice Levine, writing separately in dissent, would "equitably toll" the one-year claim period in this case on the ground that Grotte received pay from Phillips when he missed work because of his lung condition. This issue was not raised by Grotte. He has not asserted that the claim period should be tolled because he received some pay from Phillips during his absence.

Justice Meschke, quoting 2B Larson's Workmen's Compensation Law, § 78.43(c) (1989), states that receipt of employer-paid income or medical benefits "has usually, but by no means invariably been held to toll" the period for filing a workers compensation claim. However, the Montana Supreme Court cogently explains why employer-paid compensation must be comparable to or greater than workers compensation benefits to toll the claim period:

" 'Compensation,' in order to toll the statute of limitations, must consist of benefits substantially comparable to or greater than the benefits available to the same employee under the Workers' Compensation Act.

\* \* \* \* \* \*

"Compensation, to toll the statute, must be sufficient to convince the recipient that he is receiving such a large percentage of workers' compensation benefits available to him that to seek further benefits would be a wasted effort. 'The purpose of the tolling provi-

sion is to prevent an employer from lulling a claimant into a false sense of security by apparently acknowledging the validity of his claim, paying remuneration in lieu of compensation, and then invoking the statute after the lapse of one year.' " *Frost v. Anaconda Co.*, 198 Mont. 216, 645 P.2d 419, 422 (1982).

Grotte does not even argue that his employer-paid sick leave and insurance benefits were comparable to the workers compensation benefits he could have sought.

■ Furthermore, this is not an appropriate case for this court to toll the claim period on grounds of equity or public policy, because any reasonable tolling of the limitation period would not change the result. When an employer voluntarily pays an injured employee benefits under circumstances that warrant the tolling of the claim period, generally the period for filing a claim begins to run from the date the last payment is received. 2B Larson's Workmen's Compensation Law, § 78.43(a) (1989). Grotte received some sick leave from Phillips, but he did not file his workers compensation claim until about eighteen months after receiving the last of those payments. The filing period is one year, so Grotte's claim was untimely, even if the circumstances justified tolling the claim period until he had received his last benefit payment from Phillips.

Justice Levine advocates tolling the claim period until Grotte's lung condition worsened after he had received his last sick leave payment from Phillips, becoming "sufficiently symptomatic to alert him ... of the need to take action." She states that until his lung condition worsened Grotte had no reason to apply for workers compensation benefits after his sick leave benefits ceased. There may have been good reason for Grotte to seek workers compensation benefits immediately after the Phillips' payments ceased, or even while he was receiving benefits from Phillips. By that time Grotte had missed numerous days from work and had incurred medical expenses. For some of the days that Grotte missed work because of his lung condition, Phillips paid him only one-

half of his regular pay. It is possible that Grotte would have received more pay for days missed from work if he had filed a workers compensation claim. *See* Section 65–05–09, N.D.C.C. The current record is incomplete and unclear whether Grotte received company benefits, through health insurance or otherwise, reimbursing him for his medical expenses to the same extent as workers compensation benefits. Consequently, the record does not support a conclusion that Grotte did not have good reason to apply for workers compensation benefits while he was getting company sick leave, or thereafter.

Justice Meschke cites *Schmidt v. Grand Forks Country Club*, 460 N.W.2d 125 (N.D.1990), as an example of "another context" where we applied the doctrine of equitable estoppel to toll the running of a statute of limitations. However, in *Schmidt, supra*, this court recognized that questions underlying the estoppel issue are fact questions to be decided by the factfinder. In this case, the factfinder decided that Phillips did not mislead Grotte into filing an untimely claim, and that finding is supported by a preponderance of the evidence. Also, we held in *Schmidt, supra*, that a party cannot invoke the doctrine of equitable estoppel to toll a limitations period unless that person exercises due diligence in commencing appropriate legal proceedings after the circumstances giving rise to the estoppel have ceased. If we assume that Phillips' payment of UAB to Grotte somehow prevented him from filing a timely workers compensation claim, the result is the same, because Grotte did not exercise due diligence in pursing his claim after the Phillips' payments to him ceased.

Grotte did not request the tribunals below, nor has he requested this court, to toll the statute of limitations on the ground that he received employer compensation in lieu of workers compensation benefits. Furthermore, the facts of this case, as determined by the trier of fact, do not warrant tolling of the claim period by this court on equitable grounds. For these reasons, it would be inappropriate for us to toll the claim period on our own motion.

In accordance with this opinion, the judgment of the district court, affirming the Bureau's dismissal of Grotte's claim, is affirmed.

VANDE WALLE and JOHNSON, JJ., concur.

LEVINE, Justice, dissenting.

I agree with Justice Meschke's view that an employee's receipt of non-workers' compensation benefits should equitably toll the statute of limitations. The question is, for how long? The cases cited by Justice Meschke indicate that the statute of limitations for filing a claim for workers' compensation benefits should not begin to run until receipt of the last payment of non-workers' compensation benefits. Here, the facts indicate that Grotte filed his claim for workers' compensation benefits about one and one-half years after he received his last payment of on-job benefits. So, tolling the statute's one-year limitation until after the receipt of on-job benefits would not help Grotte. But, Grotte had no reason to apply for workers' compensation benefits after his on-job benefits were discontinued. His condition was not acute and required no medical attention. When it worsened, he filed a claim for workers' compensation benefits. I would hold that the statute of limitations should be tolled at least until the employee's condition or injury becomes sufficiently symptomatic to alert him or her of the need to take action.

This case reminds me of *State v. Nelson*, 488 N.W.2d 600 (N.D.1992), where a majority of the court, in effect, disagreed with the trial court's credibility assessment of two police officers, and reversed the trial court's order of dismissal. Here, the majority correctly, I believe, refuses to reassess the credibility determinations made by the Bureau. While I agree with Justice Meschke that the Bureau was mistaken in its view that the employer was telling the truth, I disagree that this court can redo that determination. However, because I believe the statute of limitations should be tolled, I would reverse the decision of the Bureau.

I, therefore, respectfully dissent.

MESCHKE, Justice, dissenting.

I respectfully dissent. In my opinion, the limitation time for this claim was equitably tolled by payments made by claimant's employer in lieu of a workers' compensation claim.

While working as an oil field operator for Phillips Petroleum, Timothy Grotte was exposed to corrosive chemicals, including hydrogen sulfide gas. In June 1987, Grotte was hospitalized with pneumonia. After using Unavoidable Absence Benefits for employee illness, furnished by his employer and approved by his supervisor, LeRoy Sandberg, Grotte returned to work two weeks later. Grotte later developed bronchitis, and by fall his breathing was raspy, he was short-winded, and his lungs burned.

On November 23, 1987, accompanied by his Phillips "boss," Sandberg's Relief Supervisor Ron Ritzke, Grotte was examined by Dr. Ebel, a company-approved physician. Dr. Ebel reported that Grotte's "condition indeed has been aggravated by the fumes that he is exposed to during his time of work." Dr. Ebel reported that, "being exposed to the fumes and irritants at work, it is quite conceivable that continuous irritation in the respiratory tract, especially in the right lung (that was previously diseased [in June 1987]) continued, leaving him with a type of chronic condition and some sort of disability." Dr. Ebel recommended that Grotte "should be put on sick leave for approximat[e]ly one week after which his condition should be re-evaluated." Grotte was off work for one week. On November 30, Dr. Ebel reported that Grotte's lungs "seem a lot better." Grotte then returned to work.

During his time off between November 23 and 30, Grotte was seen shopping at the grocery store by his supervisor. A few days later, Sandberg phoned Grotte at home, accused him of using his sick leave as vacation, and suspended him. Grotte quarreled with Sandberg and McCollum, Sandberg's superior, but was reinstated after enlisting the assistance of John Morrison, a Human Resource Representative

from the Phillips' Denver office. In addition to intervening on Grotte's behalf with Sandberg and McCollum, Morrison had the company physician contact Dr. Ebel with suggestions about treating Grotte's condition. On December 8, Grotte was given "a minimum of a month off" to recover.

Because Grotte had worked for Phillips for four years at the time of his illness, he was eligible for up to 12 weeks of Unavoidable Absence Benefits (UAB) from his employer. These benefits covered employee illness, non-occupational injuries, and alcoholism or drug rehabilitation, as well as "On–Job" injuries and illnesses. Phillips' Summary Plan Description explains "On–Job" benefits:

WHAT IS "ON–JOB" UAB?

"On-job" UAB is a Company-sponsored benefit policy covering ... employees ... who are injured while on the job or suffer a sickness which is directly job connected.

For Grotte, the plan scheduled benefits of 100% regular pay for the first four weeks of unavoidable absence, and 50% regular pay for the next eight weeks.

Grotte's month-long convalescence was compensated by On–Job UAB, partly at 100% and partly at 50% of his regular pay. When he couldn't "cut it" on the reduced paychecks, Grotte inquired about workers' compensation benefits stated in his company's UAB policy for On–Job benefits:

DO WORKER'S COMPENSATION PAYMENTS AFFECT MY BENEFITS?
Each absence under this policy is covered by provisions of and charged against the on-job benefits schedule. *Any time worker's compensation benefits are or may be payable in connection with an injury or absence the matter must be referred to Phillips Property Taxes, Real Estate and Claims office before UAB payments are made. This is where a determination will be made as to the amount, if any, of worker's compensation benefits payable.* If your worker's compensation payments, excluding hospital or medical expenses, are less than the amounts shown in the schedule of benefits for your sickness or injury

..., partial on-job disability benefit payments will be made. These payments will be in such amount as is necessary to bring the total benefit you receive up to the proper amount shown in the schedule.

(Emphasis added). Grotte testified that he asked Sandberg several times if he could file for workers' compensation benefits, but that Sandberg told him, "No. I told you, our insurance benefits are good enough to take care of this." No company action was taken about a workers' compensation claim. By January 4, 1988, Grotte's lungs were clear enough to return to work.

In March 1988, Grotte broke a rib during work. A company safety person took him to the hospital and also filed a workers' compensation claim for him. Although Grotte continued to have mild respiratory problems, he took no additional time off from work.

When Phillips' facilities were purchased by Amerada Hess in July 1988, Grotte was laid off. After the layoff, Grotte reported that the "coughing or burning or the raspiness" stopped, and he "felt good for a change."

Unable to find another job, Grotte received unemployment benefits until February 1989. In March 1989, Grotte began work for another company as an oil field sales representative. This work again exposed Grotte to hydrogen sulfide gas and, within a short time, he developed bronchitis. In April 1989, Grotte was hospitalized with pneumonia. Grotte filed a workers' compensation claim in May 1989 for the lingering lung condition that stemmed from his work with Phillips.

The Bureau dismissed the claim as untimely, concluding that the "claim was filed more than one year after [Grotte] reasonably knew the condition was work related." Grotte petitioned the Bureau for rehearing and, after a telephone hearing, the Bureau affirmed the dismissal. Grotte appealed. The district court affirmed the Bureau's decision. Grotte appeals.

The central question is whether Grotte timely applied for workers' compensation benefits. Grotte was aware of the occupa-

tional nature of his condition by November 1987, but he had no permission from his employer to file a compensation claim while he was receiving Unavoidable Absence Benefits pursuant to the employer's controlling policy for an "On–Job" condition.

Grotte argues that he failed to file timely because he was, at least, "discouraged" from filing a claim, if not "actively and purposely misle[ ]d" by his employer. Grotte testified that, when he showed Sandberg that the UAB policy indicated that he might be entitled to workers' compensation, Sandberg refused to consider it.

Grotte's testimony corresponds with Phillips' written policy stating that its Claims office would determine "the amount, if any, of worker's compensation benefits payable." Furthermore, Grotte followed policy directions to seek benefits through his supervisor:

WHAT MUST I DO TO START MY BENEFITS?

You must notify your immediate supervisor as far as possible in advance of all absences.

The Bureau relies on Sandberg's denial of any conversation with Grotte about workers' compensation benefits, arguing that "Sandb[e]rg had no motivation to keep Grotte from filing." However, consistent with Grotte's testimony, Sandberg testified: "We had administrative people that took care of that." Sandberg's otherwise inconsistent position, that "it's the employee's responsibility to take the [workers' compensation] form and get it filled out," cannot be fairly credited. *See State v. Nelson*, 488 N.W.2d 600 (N.D.1992). Moreover, documentary evidence belies Sandberg. The employer's policy delegated to its Claims office the "determination ... as to the amount, if any, of worker's compensation benefits payable" when Phillips paid On–Job Unavoidable Absence Benefits. The employer's policy directed the employee to work with his "immediate supervisor" on a job-connected sickness.

We have not addressed a like question on an untimely workers' compensation claim before, but parallel precedents from other jurisdictions persuade me that equitable tolling applies. *Frost v. Anaconda Co.*, 198 Mont. 216, 645 P.2d 419 (1982) (Payment of benefits to employee pursuant to a benefit program for employees unable to work due to a disability, whether or not work related, equitably tolled the statute of limitations where payments were substantially comparable to workers' compensation benefits and when the employer had knowledge that the claim was based on an industrial accident); *Godwin v. Scott Paper Co.*, 571 So.2d 1126 (Ala.Civ.App.1990) (Employer's in-lieu payments to partially-disabled claimant of full salary despite reduced work equitably tolls statute of limitations for workers' compensation claim). *See*, generally, 2B *Larson's Workmen's Compensation Law* § 78.43(c) (1989): "When payment of either income or medical benefits has been made by a private employer-employee benefit association or insurance plan, this has usually, but by no means invariably been held to toll the statute."

We have recognized and described the doctrine of equitable tolling of a statute of limitations in another context:

The doctrine of equitable estoppel may operate to preclude the application of a statute of limitations as a defense by one whose actions mislead another, thereby inducing him to not file a claim within the statute of limitations. Thus, a delay may be excusable "where, provided it is not unreasonably protracted, it is induced by defendant's promises, suggestions, or assurances which, if carried into effect, would result in a solution or adjustment without litigation." The reason for the rule is that "one cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." While "the mere conduct of settlement negotiations or discussions by a defendant with a plaintiff does not alone provide a basis for estopping the defendant from pleading the statute of limitations," it is sufficient if the defendant's " 'conduct or promises

are such as are naturally calculated to and do "induce plaintiff into a belief that his claim would be adjusted if he did not sue." ' "

*Schmidt v. Grand Forks Country Club,* 460 N.W.2d 125, 129–30 (N.D.1990). (Citations omitted). *Compare White v. North Dakota Workers Compensation Bureau,* 441 N.W.2d 908 (N.D.1989) (Claim not time barred two years after injury when employer's administrator advised employee that he was not allowed to file a claim that was not authorized by a doctor). Because NDCC 65–01–01 calls for "sure and certain relief" to a worker injured in hazardous employment, it is appropriate to apply equitable tolling to a worker's compensation claim.

Larson elaborates on equitable tolling to excuse an untimely worker's compensation claim:

A familiar defense to assertion of the bar of late claim is the plea that the lateness was the result of the employer's assurances, misrepresentations, negligence, or even deliberate deceptions. In the states having statutes permitting for good cause or mistake, the [ ] excusing of late claims issue is simply whether the facts satisfy the statute; in other states the issue usually takes the form of the question whether the employer should be held estopped to invoke the bar.

The commonest type of case is that in which a claimant, typically not highly educated, contends that he was lulled into a sense of security by statements of employer or carrier representatives that "he will be taken care of" or that his claim has been filed for him or that a claim will not be necessary because he would be paid compensation benefits in any event. When such facts are established by the evidence, the lateness of the claim has ordinarily been excused.

2B *Larson's Workmen's Compensation Law* § 78.45. (Footnote omitted). Equitable tolling should excuse the lateness of Grotte's claim.

In my opinion, the greater weight of all of the evidence in this case, particularly documentary evidence, demonstrates that Grotte was discouraged and directed by a company policy and by in-lieu payments not to file a timely claim for workers' compensation benefits. As a good employee conforming to his employer's policies, Grotte unwarily depended on his "employer's presumably greater knowledge." *Neuberger v. Hennepin County Workhouse,* 340 N.W.2d 330, 332 (Minn.1983) (Employer equitably estopped from pleading statutory time bar against a worker's compensation claim when employer was primarily responsible for the failure to file). After the in-lieu payments while he was employed by Phillips, apparently Grotte had no further need to file a claim until his relapse in March 1989. *See Lass v. North Dakota Workmen's Compensation Bureau,* 415 N.W.2d 796 (N.D.1987) (Workmen's Compensation Act did not permit Bureau, in denying present benefits, to deny future benefits upon a change in claimant's medical condition). I would conclude that the limitation time for filing Grotte's claim was equitably tolled because Phillips misled him by paying other benefits in lieu of workers' compensation benefits.

I would reverse and remand to the Bureau for consideration of Grotte's claim. Therefore, I respectfully dissent.